IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL J. PREZIOSI, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:20-cv-1163 |
| | ) |
| vs. | ) |
| | ) |
| ALAN MORRIS, BRIAN MANSBERRY, | ) |
| KELLEY FALCIONE, CHARLES | ) |
| FOWLER, CO JOHNSON, MICHAEL | ) |
| ZAKEN, JOHN E. WETZEL, and | ) |
| TREVOR A. WINGARD, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment (ECF No. 40).[1]

I. **Relevant Procedural History**

Plaintiff Daniel J. Preziosi is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC") who at all relevant times was housed at the State Correctional Institution at Greene ("SCI-Greene"). In this civil rights action brought under 42 U.S.C. § 1983, Preziosi claims that Defendants were deliberately indifferent and failed to protect him from an attack by another inmate in violation of his rights under the Eighth Amendment.

Preziosi, who is represented by counsel, initiated this case by filing the original complaint (ECF No. 1) which named as defendants the following four individuals who worked at SCI-Greene during the events at issue: Corrections Counselor Brian Mansberry; Psychological Services

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case as authorized by 28 U.S.C. § 636.

1

Specialist Kelley Falcione; Corrections Officer ("CO") Charles Fowler; and CO Brett Johnson. After these defendants answered the original complaint and the parties engaged in some discovery, Preziosi filed the Amended Complaint (ECF No. 32), which is the operative pleading. The Amended Complaint names the original four defendants and also adds as defendants the following four individuals: Michael Zaken, who was SCI-Greene's Deputy Superintendent; Security Lieutenant Alan Morris;[2] John Wetzel, who was the Secretary of the DOC; and Trevor Wingard, who was the Deputy Secretary of the Western Region of the DOC. Wetzel, Wingard, Zaken and Morris are collectively referred to as "Supervisory Defendants."

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 40), which has been fully briefed (ECF Nos. 41, 42, 43, 46, 47, 48, and 49).

## II. Relevant Factual Background[3]

Preziosi was assigned to SCI-Greene's Residential Treatment Unit ("RTU") for all periods relevant here. ECF No. 32, ¶ 13; ECF No. 42, ¶¶ 4, 5. The RTU houses about 160 prisoners and is a treatment block for inmates who may have mental health needs. ECF No. 42, ¶ 7.

In June 2019 Preziosi was housed with a new cellmate, James Smith. *Id.*, ¶ 9. On or about July 30, 2019, Smith was placed in a Psychiatric Observation Cell ("POC") after he engaged in erratic behavior. Specifically, while in the cell that he shared with Preziosi, Smith was pacing, crying, and mumbling, as well as kicking and punching the wall and door. *Id.*, ¶¶ 31-32. During the episode Smith approached Preziosi lying in bed and said, "What could they do if I started fucking you up?" *Id.*, ¶ 31.

---

[2] The Court notes that Defendants have omitted Morris as a defendant in their caption and, at times, in their pleadings. It is assumed that these omissions were inadvertent.

[3] These facts are undisputed unless otherwise noted.

2

About two days after being placed in the POC Smith was returned to the cell with Preziosi. *Id.*, ¶¶ 33-34. Preziosi claims that the prison's mental health policies were not followed when Smith was put back into their shared cell because Smith was not released to a "close" cell to allow for 15-minute observation rounds, he was not granted daily visits with a psych counselor, and he did not have a weekly visit with the psychiatrist. *See* Preziosi Grievance, ECF No. 43-2 at p. 47. Defendant Falcione testified that:

> When an inmate is released from POC, there is a three-day follow up by a psychological services specialist assigned to that housing block, and/or you find an individual from the psychology department to cover for three consecutive business days. Then a PRT [psychiatric review team] is scheduled to go over the treatment goals and objectives and adjust based upon the rationale behind the POC placement.

Falcione Dep., ECF No. 43-5 at p. 18.

Upon Smith's return to the cell he shared with Preziosi, Preziosi observed that Smith was acting oddly again. *See* Preziosi Dep., ECF No. 43-4 at pp. 32-34. On August 19, 2019, Preziosi states that he advised Mansberry and Falcione that Smith was pacing at night and refusing to speak. *Id.* Neither Mansberry nor Falcione recall this conversation or any discussion with Preziosi about Smith. ECF No. 42, ¶ 46. Preziosi also told Mansberry that Smith was behaving worse than he was before being removed to the POC and that Preziosi was uncomfortable. *See* Preziosi Dep., ECF No. 43-4 at pp. 32-33. Preziosi requested that Mansberry remove Smith or transfer Preziosi to another cell. *Id.* at p. 34. No action was taken to separate Preziosi and Smith. Neither Mansberry nor Falcione recall that Preziosi brought to them any concerns about his safety before August 21, 2019. ECF No. 42, ¶ 51.

In the early morning hours of August 21, 2019, Johnson and Fowler, both of whom are correctional officers, were on duty on the RTU block. The typical staffing for the night shift in the RTU was two officers. *Id.*, ¶¶ 59-60. During the early morning hours, while Preziosi was

sleeping, Smith began beating Preziosi's head and face with a metal padlock. *Id.*, ¶ 68; Preziosi Dep., ECF No. 43-4 at p. 40. Smith also attacked Preziosi with a razor and choked him. *Id.* at pp. 41-42. Preziosi tried to notify the guards by pushing the emergency button near the cell door while trying to fend off Smith. Preziosi also kicked the door and screamed for help. *Id.* According to Preziosi, "I remember hearing—everybody was screaming, saying, you know, he's going to kill him; they're fighting." ECF No. 43-4 at p. 43. At one point Preziosi slid under the bed and used a box for protection. Smith then put the padlock into a sock and swung it under the bed to hit Preziosi in the head. *Id*. Preziosi asserts that the attack lasted 20 to 30 minutes before any prison staff responded to the emergency. ECF No. 47, ¶¶ 67-70.

During the relevant time, Johnson was conducting rounds and Fowler was manning the control center, otherwise known as the bubble. *See* Dep. Fowler, ECF No. 43-8 at p. 6; Dep. Johnson, ECF No. 43-9 at p. 6. When Johnson returned to the bottom tier of B-Pod of the RTU block he heard another inmate yelling for help and found Preziosi under the bed and Smith kicking at him. ECF No. 42, ¶¶ 73, 74. Because Smith refused Johnson's orders to stop kicking and come to the door, Johnson sought and obtained approval for the use of OC Spray, and then had to leave to retrieve it. *Id.*, ¶ 75-77. Johnson introduced three bursts of the OC Spray through the food tray slot and eventually exhausted the whole canister of OC Spray without gaining Smith's compliance. *Id.* Eventually, back-up officers arrived and additional OC Spray was deployed which de-escalated the situation. Smith was then placed in handcuffs and taken away. *Id.*, ¶ 78-79. Preziosi was taken to the infirmary with wounds on his head and body. The open wounds were stapled and stitched. ECF No. 43-4 at p. 44.

Fowler, who was stationed in the bubble throughout the incident, was alerted to the attack only by Johnson's radio call. *Id.*, ¶ 83. It is unknown why Fowler was not alerted when Preziosi and other inmates pushed their emergency buttons because "if an inmate engages the call button it will 'make an audible noise and blink' on the panel in the control center." *Id.*, ¶ 63. Fowler did not recall any alerts to the booth from Preziosi's emergency button, although he admits he wasn't looking at the control panel. *Id.*, ¶ 84; Fowler Dep., ECF No. 43-8 at p. 6.

After the attack Smith told prison personnel that Preziosi had sexually assaulted Smith. An investigation was initiated under the DOC's Prison Rape Elimination ("PREA") policy. ECF No. 42, ¶¶ 92-94. Defendant Morris was assigned to Smith's case pursuant to PREA procedure to investigate the complaint. *Id.*, ¶ 92 and n.3. Prior to the investigation of the PREA complaint, Morris had no involvement or interaction with Smith or Preziosi. *Id.*, ¶ 93. The investigation of the PREA allegation determined that Smith's claim of sexual assault was fabricated. *Id.*, ¶ 96.

On September 1, 2019, Preziosi filed Grievance 821390. ECF No. 43-2 at pp. 46-47. The parties agree that it is the only grievance submitted by Preziosi that is relevant to this lawsuit. ECF No. 42, ¶ 120; ECF No. 47, ¶ 120. The grievance consist of two handwritten pages. Preziosi wrote in it that he "is raising claims of illegal and negligent actions, and [of] violated policies that led to" Smith's assault of him. ECF No. 43-2 at p. 46. He explained that before the assault he informed both Falcione and Mansberry that he was concerned about Smith's behavior. *Id.* at pp. 46-47. Preziosi contended that the DOC's "13.8.1 Mental Health Policy" was not followed after Smith was released from the POC and return to Preziosi's cell. *Id.* at p. 47. It was not followed, Preziosi maintained, even though he had alerted Falcione, Mansberry and a "block c/o" about Smith's troubling behavior. *Id.*

5

Preziosi also faulted the "block c/o" and the "bubble c/o" for failing to adequately respond to Preziosi's and the other inmates' pleas for help during Smith's assault. *Id.* Defendants acknowledge that the "block c/o" and "bubble c/o" that Preziosi identified in the grievance sufficiently described Johnson and Fowler, respectively. ECF No. 41 at p. 6.

Preziosi sought the following relief in the grievance: a single cell; an investigation of the security rounds during the night on the RTU block as well as after an inmate is released from a POC; "action on emergency button to prevent future near fatal attacks and medical emergencies"; camera records; and, the names of "all John Does working [on] the RTU block and bubble" the night of the assault. ECF 43-2 at p. 47. He also requested that "all named persons herein and all John Does, including hierarchy" pay him compensatory and punitive damages. *Id.*

The assigned officer denied Preziosi's grievance. This officer concluded after his investigation that there was "no evidence to support [Preziosi's] claim that staff was negligent or violated policy that allowed you to be assaulted." *Id.* at p. 48. Preziosi's subsequent appeals to the superintendent of SCI-Greene and then to the DOC's Secretary's Office of Inmate Grievances and Appeals ("SOIGA") were denied. *Id.* at pp. 49-51.

In the Amended Complaint, Preziosi asserts that Defendants, collectively, violated his Eighth Amendment rights because they failed to protect him from Smith's assault. ECF No. 32, ¶¶ 79-95. As for the Supervisory Defendants, Preziosi specifically claims that they violated his Eighth Amendment rights because they implemented or maintained "policies, practices or customs" that: assigned only two COs to conduct rounds on A Block; allowed inmates to have metal padlocks and razors without regard to the inmate's mental status; accepted the existence of defective emergency buttons in cells; and, designed the control center in a bubble which prevents

6

the CO stationed there from hearing screams for help. *Id.*, ¶¶ 96-101; see also ECF No. 46 at pp. 27-33.

In their motion for summary judgment, Defendants argue that the Supervisory Defendants are entitled to judgment in their favor because Preziosi procedurally defaulted all claims he has brought against them as a result of his failure to exhaust his administrative remedies as to those claims. Defendants also argue that they are entitled to judgment in their favor as to the merits of the Eighth Amendment claims Preziosi has brought against each of them. Preziosi asserts that Defendants' motion must be denied because multiple genuine issues of material fact preclude judgment in Defendants' favor.

### III. Standard of Review

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could affect the outcome of litigation. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Yet "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence showing a lack of genuine triable issues. *See Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue of material fact that

precludes summary judgment. *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court must view all facts and draw all inferences in the light most favorable to the non-moving party. *See id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *See Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to show the existence of a genuine issue. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

IV. **Discussion**

    A. <u>Claims Against the Supervisory Defendants</u>

        1. The PLRA Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions. 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is a "non-jurisdictional prerequisite to an inmate bringing suit" and when raised by a defendant it

constitutes a threshold issue to be addressed by the court. *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018).

The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638-39 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Courts are not given discretion to decide whether exhaustion should be excused, *Ross*, 578 U.S. at 640-41, and there is no exception to the exhaustion requirement based on "futility," *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained but also that failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default. *See Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004). That is because "the PLRA exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93; *Spruill*, 372 F.3d. at 227-30.

Importantly, the prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 231 ("prison grievance procedures supply the yardstick for measuring procedural default"). Thus, the procedural requirements for exhaustion in a given case "are drawn from the polices of the prison in question rather than from any free-standing federal law." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Spruill*, 372 F.3d at 231).

9

The Court of Appeals has explained that if the defendant shows that the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her." *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). When, as is the case here, "there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment." *Id.*

The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 136 S. Ct. at 1859 (quoting *Booth,* 532 U.S. at 738).

> [It] identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 135 S. Ct. at 1859-60). *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable). The Court of Appeals has further held "that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement" but only as to the matters complained of and the relief sought in the grievance. *Shifflett*, 934 F.3d at 365. Absent a situation in which administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'" *Ross*, 136 S. Ct. at 1856.

10

2. The Inmate Grievance System in DOC Institutions

The DOC has an official Inmate Grievance System that governs the grievance and appeals process in Pennsylvania correctional institutions. *See* 37 Pa. Code § 93.9. The Inmate Grievance System that is relevant to this case is set forth in DC-ADM 804, which "is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate[,]" including challenges or complaints about prison policies. ECF No. 43-2 at p. 11, DC-ADM 804, § 1.A.2; *see also id.* at p. 13, DC-ADM 804 § 1.A.13 ("[a]n inmate who has been personally affected by a Department and/or facility action or policy will be permitted to submit a grievance.").

DC-ADM 804 sets forth a three-tier administrative remedy system. A prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review. *Id.* at p. 12, § 1.A.8. The prisoner must appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager. *Id.* at p. 22, § 2.A. From there, the prisoner must appeal to SOIGA for appeal to final review. *Id.* at p. 25, § 2.B.

As previously noted, the prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31. There are several requirements to filing a proper grievance in accordance with DC-ADM 804. Relevant here, DC-ADM 804 requires:

> The text of the grievance must be legible, understandable, and presented in a courteous manner. *The inmate must include a statement of the facts relevant to the claim*.
>
> a. The statement of facts shall include the date, approximate time, and location of the event(s) that gave rise to the grievance.
>
> b. *The inmate shall identify individuals directly involved in the event(s).*

      c.      The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.

      d.      If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.

*Id.* at p. 12, § 1.A.11 (emphasis added).

      3.      All Claims Against the Supervisory Defendants Are Procedurally Defaulted

Defendants argue that Preziosi did not exhaust his administrative remedies for any of the claims he has brought against the Supervisory Defendants and as a result, he has procedurally defaulted these claims. In support, Defendants correctly point out that in his grievance Preziosi did not: (1) identify any Supervisory Defendant, either by name or by job title or description, as having involvement in the events surrounding Smith's assault on him; or (2) challenge any policy or custom that a Supervisory Defendant allegedly implemented, maintained, or to which he acquiesced, that led to that assault (that is, the alleged policies or customs that allowed inmate access to padlocks and razors, understaffing, defective emergency buttons or the poorly designed control center).

As for the first factor (the failure to identify), Preziosi counters that DC-ADM 804 does not require an inmate to "name" individuals involved in the event about which they are grieving. This argument is not persuasive. While it is true that the identification requirements of DC-ADM 804 § 1.A.11 did not require that Preziosi refer to a Supervisory Defendants by name, it did require that he at least provide enough information indicating they were involved in the events about which he was complaining. For example, it would have been acceptable for Preziosi to have identified a Supervisory Defendant in the grievance by job title or job duty, but he did not do so. *See, e.g., Travillion v. Wetzel*, 765 F. App'x 785, 789 (3d Cir. 2019) (citing *Johnson v. Johnson*, 385 F.3d

12

503, 523 (5th Cir. 2004) ("a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice")).

Preziosi knew he could identify the Supervisory Defendants in the grievance by describing them by their job title or duties because that is how he identified Defendants Johnson ("block c/o") and Fowler ("bubble c/o"). It is also how Preziosi described the "John Doe" individuals he believed were involved in Smith's assault, which is why he wrote that they were working on the "RTU block and bubble" and requested their names as part of the relief he was seeking. *See* Preziosi Grievance, ECF 43-2 at p. 47 (seeking as relief the names of "all John Does working RTU block and bubble" the night of the assault).[4] That Preziosi described other individuals by job duty or title in the grievance belies his argument that he could not name the Supervisory Defendants because he did not know their names.

Preziosi also contends that the reference he made in the grievance to "John Does, including hierarchy" was enough to satisfy the identification requirements of DC-ADM 804 § 1.A.11 as to the Supervisory Defendants. It was not. That reference was only about the damages Preziosi was seeking, not about who was involved in Smith's assault of him. In any event, Preziosi's request for damages from "all named persons herein and all John Does, including hierarchy" is much too broad a descriptor to identify any of the Supervisory Defendants. It provides no guidance as to whom Preziosi was referring and could range from other corrections officers or mental health professionals or their direct supervisors all the way up to the Secretary of the DOC. The divergent

---

[4] Moreover, contrary to the assertion in his brief, Preziosi only requested the names of the John Does working in the RTU or the bubble, and in his appeal, he only asked for "c/o's names working." *See* Preziosi Grievance and appeals, ECF No. 43-2 at pp. 47, 49.

13

duties of the four Supervisory Defendants further undermines a conclusion that Preziosi sufficiently identified them by his mere reference to "hierarchy."

Thus, Preziosi did not exhaust any claim he has brought against the Supervisory Defendants because he did not identify them in the grievance.

In response to the second deficiency outlined above by Defendants (Preziosi's failure in his grievance to raise any claim challenging a policy that a Supervisory Defendant allegedly implemented, maintained, or to which he acquiesced), Preziosi argues that the prison grievance manual does not include instructions about what an inmate must do when he is grieving about a policy. That argument has no merit. DC-ADM 804 § 1.A.13 expressly states that "[a]n inmate who has been personally affected by a Department and/or facility action or policy will be permitted to submit a grievance." ECF No. 43-2 at p. 13. Thus, if Preziosi wanted to challenge a policy or custom, he had to do so in accordance with the straightforward instructions set forth in the manual at DC-ADM 804 § 1.A.11. That is, among other things, Preziosi had to describe the policy or custom he was challenging and identifying the supervisory officials or policymakers responsible for its creation or implementation. Preziosi did not do so. Rather, in his grievance Preziosi only identified Falcione, Mansberry, Fowler, Johnson and "John Does working RTU block and bubble" as having involvement in the events about which he was complaining. He also only complained about alleged *violations* of DOC policy. He did not assert that he was *challenging* any DOC policy or custom.

For all of these reasons, Defendants have satisfied their initial burden of proving that Preziosi failed to exhaust all claims he has brought against the Supervisory Defendants. The burden now shifts to Preziosi to show that the administrative remedies were unavailable to him for claims against the Supervisory Defendants. *See, e.g.*, *Rinaldi*, 904 F.3d at 268. Preziosi has not

14

satisfied this burden. He argues that the grievance process was unavailable because he did not know the Supervisory Defendants' names and also because the DC-ADM 804 is "opaque" since it allegedly does not include instructions about what an inmate must do when grieving a policy. Neither of these arguments has merit for the reasons already discussed.

Based on the above, Preziosi procedurally defaulted all claims he has brought against the Supervisory Defendants in this case. *See, e.g.*, *Green v. Maxa*, No. 1:17-cv-223, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020) (granting summary judgment for those defendants the plaintiff failed to identify in his grievance in contravention of "the DC-ADM's directive that inmates identify the individuals involved in the event" that is the subject of the grievance); *Sides v. Pennsylvania Dep't of Corr.*, No. 2:18-cv-145, 2020 WL 1493549, at *13 (W.D. Pa. Mar. 27, 2020) (plaintiff did not exhaust his claims brought against supervisory officials because in his grievance he did not identify them or challenge any prison policy or practice.) Accordingly, the Court will enter judgment in the Supervisory Defendants' favor.[5]

### B.  Claim against Mansberry, Falcione, Fowler and Johnson

Turning next to Preziosi's Eighth Amendment claims against the remaining defendants,[6] he asserts that although Mansberry and Falcione had notice of Smith's dangerous mental health issues, they failed to follow protocol to monitor/treat those issues. Further, they failed to take

---

[5] Defendants have also presented alternatives grounds in support of their contention that the Supervisory Defendants are entitled to summary judgment. The Court's determination that Preziosi procedurally defaulted all claims that he has brought against the Supervisory Defendants obviates the need to address these alternative arguments.

[6] Preziosi bring his Eighth Amendment claims under 42 U.S.C. § 1983. To prevail on such claims, he must show that these defendants violated his Eighth Amendment rights and did so when they were acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). There is no dispute that Mansberry, Falcione, Fowler and Johnson were acting under color of state law. Thus, the only issue here is whether there is a genuine issue of a material fact as to whether any of them violated Preziosi's Eighth Amendment rights.

action to separate Smith from Preziosi even after Preziosi warned them of Smith's mental health decline. As for Fowler and Johnson, Preziosi alleges that they acted with deliberate indifference to his safety by failing to timely respond to Smith's attack on Preziosi.

Two requirements must be met to prove a violation of the Eighth Amendment: first, the deprivation of rights alleged must be, objectively, "sufficiently serious," and second, a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). To satisfy the second prong of the test, a prison official must have a "sufficiently culpable state of mind." *Id*. (citations omitted). "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id*. "A prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 825.

"[D]eliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Servs.*, 850 F.3d 528, 535 (3d Cir. 2017). Because a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the *Farmer* standard does not require a defendant to admit his consciousness of the risk of serious harm before liability can be imposed. However, even gross errors of judgment are not constitutional violations; liability requires subjective, not objective, culpability. *Farmer*, 511 U.S. at 843 n.8.

As the Court of Appeals for the Third Circuit has explained:

> "Deliberate indifference," therefore, requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. *See Farmer v.*

16

>   *Brennan*, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted
>   or failed to act despite his knowledge of a substantial risk of serious harm").

*Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (parallel citations omitted).

### 1. Mansberry and Falcione

First, Preziosi states that proper protocol was not followed when Smith was taken out of the POC and placed back in a cell with Preziosi without the required observation or attention from a mental health professional. *See* Mansberry Dep., ECF No. 43-6 at pp. 7-8. Second, Preziosi states he informed Mansberry and Falcione multiple times that he believed Smith's mental health condition was deteriorating and that he was afraid Smith would hurt himself or Preziosi. Preziosi asked to be separated from Smith. *See* Preziosi Dep., ECF No. 34 at pp. 32-35.

According to their depositions, Mansberry and Falcione do not remember speaking with Preziosi about Smith's mental health condition, nor do they have any records documenting such a conversation. *See* Mansberry Dep., ECF No. 43-6 at pp. 7-8; Falcione Dep., ECF No, 43-5 at p. 22. Further, they believed Smith and Preziosi were amicable to one another. *See* ECF No. 42, ¶ 36. Mansberry and Falcione add that even accepting that a meeting did occur about the decomposition of Smith's mental state, their lack of action does not rise to the level of deliberate indifference because they did not have notice to believe Preziosi was at substantial risk of serious harm. *See* ECF No. 41 at p. 10.

As discussed above, to prevail on an Eighth Amendment claim against Mansberry and Falcione, Preziosi "must show that each official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). Mansberry and Falcione focus on the fact that Preziosi did not explicitly state that Smith would hurt him and that the information provided

17

by Preziosi about his fear of Smith's deteriorating condition was not sufficient to make them aware of the danger. Defendants assert that liability attaches only when there is a "pervasive risk of harm to inmates from other prisoners, . . . and that prison officials have displayed 'deliberate indifference' to the danger." ECF No. 41 at p. 12 (citing *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985)(citations omitted)).

A material issue of fact exists of whether Mansberry and Falcione learned of Smith's precarious mental state and whether the information they were allegedly provided (coupled with the documented recent history of Smith's mental health), could cause them to infer a safety issue for Preziosi. The record also contains evidence that Mansberry and Falcione did not follow proper protocol in observing and treating Smith upon his release from POC. As a result, a fact-finder must determine whether Mansberry and Falcione knew that the danger existed and deliberately and callously disregarded it and placed Smith in a cell with Preziosi. Accordingly, the motion for summary judgment as to the Eighth Amendments claim against Mansberry and Falcione will be denied.

        2.     Fowler and Johnson

Preziosi claims Fowler and Johnson acted with deliberate indifference to his safety and well-being while working the night shift in the RTU when Smith assaulted him. Specifically, Preziosi claims that Fowler should have been alert and watching the control board in the bubble so that he would have been notified to the emergency in Preziosi's cell either by sounds and lights triggered by an emergency button or by the screaming and banging from the other inmates. In addition, Preziosi asserts that Johnson, who was making rounds in the RTU, should have heard the commotion and come to Preziosi's aid more quickly than the alleged 20-30 minutes it took for the guards to attend to Smith's assault on Preziosi.

It is the job responsibility of a correctional officer to guard and protect the inmates who are vulnerable to attack by other inmates. *Ewing v. Cumberland Cnty.,* 152 F. Supp. 3d 269, 294 (D.N.J. 2015) ("As correctional officers, Defendants were responsible for Plaintiff's safety and had a duty to protect him from violence.") "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845. "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." *Id. at* 836.

Defendants do not contest Preziosi's allegation of how long the attack occurred. Instead, they argue that Fowler and Johnson were merely the two correctional officers on duty that night and were not on notice of any potential risk of serious harm to Preziosi. In their deposition testimony, Fowler and Johnson state they did not hear screams for help or see alerts that there was violence in Preziosi's cell. *See* Fowler Dep., ECF No. 43-8 at p. 12; Johnson Dep., ECF No. 43-9 at p. 8. This testimony supports Fowler and Johnson's contention that they could not be deliberately indifferent to something of which they were not consciously aware.

On the other hand, while Johnson and Fowler claim they were unaware of any danger to Preziosi, the Court should presume that, on a basic level, Fowler and Johnson are aware of the risks to the health and safety of each inmate, and that because mental health units in prison settings can be violent and unstable, correctional officers must act accordingly. Further, Fowler and Johnson, by the very nature of their jobs, can draw the inference between the risks associated with these types of individuals and the potential harm the risk poses to staff and inmates in the prison. Indeed, the prison has many protocols in place to handle risks, such as the very protocols that were to be exercised by Fowler and Johnson that night.

Thus, although Defendants assert that Fowler and Johnson were unaware of any danger to Preziosi, it remains an issue of fact whether they exercised their duties, at their respective stations, recklessly or with deliberate indifference to the health and safety of Preziosi given the alleged inattentive nature in which they conducted their work and the alleged 20-30-minute time-frame of the attack. Accordingly, Defendant's motion as to the Eighth Amendment claim against Fowler and Johnson will be denied.

**V.    Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 40 ) will be GRANTED in part and DENIED in part as follows:

- The Motion for Summary Judgment will be GRANTED as to all claims against Supervisory Defendants;

- The Motion for Summary Judgment will be DENIED as to the claim of Eighth Amendment failure to protect claims against defendants Mansberry, Falcione, Fowler and Johnson.

An appropriate order will follow.

BY THE COURT:

Dated: August 22, 2022              /s/ Patricia L. Dodge
                                    PATRICIA L. DODGE
                                    United States Magistrate Judge